## Case No. 3,996.

### DOOLEY v. GALLAGHER et al.

[3 Hughes, 214.][2]

District Court, E. D. Virginia. May, 1879.

##### SALE—IMPLIED WARRANTY.

There can be no implied warranty of the quality of goods which have been in existence and in the vendee's custody for some time before the sale, and are in his custody at the time of sale.

This was an action of trespass on the case brought by James H. Dooley, trustee in bankruptcy of Asa Snyder and Warner Moore, trading as Asa Snyder & Co., against the defendants, P. Gallagher, D. S. Peirce, and William Terry, trading as P. Gallagher & Co. The declaration contained two counts. The first count averred that August 26th, 1875, at Wythe county, Virginia, Asa Snyder & Co., at the special instance of defendants, agreed to buy 185 tons of charcoal pig iron at $30 per ton, or $5,450. That defendants by falsely and fraudulently warranting said iron to be an excellent article of cold-blast charcoal pig metal. suitable for making car-wheels, and that the same was of the first class of

such metal, sold said iron to said Snyder & Co. for the price aforesaid, which was afterwards paid. Whereas said iron was not when so sold and warranted what it was represented to be, but was bad and inferior material, unfit for the purpose aforesaid. That the defendants in the sale thereof, falsely and fraudulently deceived Snyder & Co., whereby they were put to great expense, loss, and inconvenience, and the plaintiff was entitled to recover therefor. Snyder made payments on drafts hereafter mentioned. The second count averred that defendants being possessed of said iron, known as "Panic," and knowing the same to be of inferior and bad quality, nevertheless fraudulently, falsely, and deceitfully represented it to Snyder &. Co. as above set out, and by means of such false, etc., representations induced Snyder & Co. to buy it at the price aforesaid, whereas the iron was not as represented, but was of bad and inferior material, unfit for the purposes above set out, as the defendants then and there well knew. And so the plaintiff averred that the defendants deceived and defrauded Snyder & Co. in said sale, and plaintiff sued for said deceit. The defendants demurred to the declaration, plead the general issue to both counts, and asked leave to file special pleas. At the trial the parties waived the demurrer, and by consent the whole matters of law and fact were submitted to the court, with leave to the defendants to introduce under the general issue any testimony, and to make any defence which could be made by special plea. It appeared from the evidence introduced on the trial that the negotiations leading to this suit were conducted on the part of Snyder & Co. by Asa Snyder, and on the part of the defendants by P. Gallagher. That they had never had business transactions with each other before, and their whole correspondence had been in writing, neither having ever seen the other prior to the day of trial. That in consequence of some newspaper notice of Asa Snyder, Gallagher wrote to him the following letter:

"Rural Retreat, Wythe Co.. Va.. August 21st, 1875. Asa Snyder, Esq.—Dear Sir: We are now making an excellent article of cold-blast charcoal pig metal, and are desirous of disposing of a lot at as early a day as possible. What can your market afford to do for us? Brands, as you know, from this Cripple Creek country are fine for car-wheel purposes. Hoping to hear from you soon, we remain, yours, etc., P. Gallagher & Co."

"Richmond, Va., August 23d, 1875. P. Gallagher & Co.—Gentlemen: I have your letter asking information about iron. Please advise me which of the Cripple Creek furnaces you are running. I must know your brand before giving quotations. If your iron is as good as the Wythe I can now sell it here at $32, four months. Very truly, Asa Snyder. Advances made of $25 per ton on consignments if warehoused."

Whereupon Gallagher replied:

---

[1] [Reprinted by permission.]

[2] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

"Rural Retreat, Wythe Co., Va., August 26th, 1875. Mr. Asa Snyder, Richmond, Va.— Dear Sir: In answer to yours of the 23d would say that ours is a new furnace which went into blast on the 9th inst. With reference to the quality of the metal would say that in our judgment it is first class. Our founderer, Mr. Rodenhiser, who worked the furnace ('Wythe') sufficiently long to know the quality of its metal, when asked by us how ours would compare with it, remarked that 'the iron of Sayers, Oglesby & Co. ("Wythe") could beat us in nothing, and for general purposes he believed ours the best.' We could send you small quantities to try it. What can four months' paper be discounted at in your city, and will you please inform us what freights have been paid to your city by Sayers, Oglesby & Co. Yours truly, P. Gallagher & Co."

After sundry other correspondence, the following letter was written:

"Richmond, Va., January 31st, 1876. Gentlemen: Your letter asking permission to draw was not received till Saturday. This a. m. I am in receipt of your letter of the 29th from Wytheville and Rural Retreat. The customer to whom I expected to sell has not bought from me; but rather than you should be disappointed, I will take it on the terms offered him, $30, four months. The iron shipped in October I have included in this sale, and will give my paper for it, as of this date, when the acceptance given for that lot matures, etc. Very truly, Asa Snyder."

It appeared that after receiving the acceptances above named, Gallagher & Co. discounted them to the Farmers' Bank of Southwest Virginia; that the acceptance on the fifty-six tons sent in October was paid, and the first of the three, dated January 20th, January 31st, and February 10th, was paid. The last two were protested, but the bank sued Snyder and recovered them from him before his insolvency.

After the reading of the letters aforesaid the plaintiff introduced one Derbyshire, an employé of the Tredegar Iron Works, who testified that he had been handling iron over twenty-five years, and could tell by breaking a pig and other processes whether a particular iron would suit for car-wheels. That he had no recollection of the particular iron in controversy; but remembered that on several occasions said Snyder had sent iron to the Tredegar works, which on inspection was by him found unsuited to car-wheel manufacture. Asa Snyder, a witness for plaintiff, testified that his whole correspondence with Gallagher & Co. was embraced in the letters read. That he never had any verbal intercourse with the firm. That he had fifty-six tons of their iron in his possession from October until January 31st, when he bought. That so far as he knew it was of same grade as that subsequently sent. That he made no examination or tests of its quality before he bought. That he is a dealer in pig iron,

and has been engaged in iron business for over twenty years. That he bought the iron on the faith of what he regarded as the assurances of Gallagher & Co. in the letters produced, but had no other assurances than they disclose. That he found after buying the iron that it was utterly unsuited to the wants of the market he was supplying, and that customers to whom he sold threw it back on his hands, and he was finally compelled to sell it, a portion at $21 and a portion at $16. A claim on the basis of these losses was produced by plaintiff.

On behalf of the defendants, P. Gallagher was introduced, who swore that he neither knew nor undertook to state to Snyder the real grade of said iron. That his whole representations appear in the letter. That he originally employed Snyder as his agent to effect a sale of said iron. That Snyder becoming purchaser was at his (Snyder's) own suggestion. That witness debated for some time before taking Snyder's offer. That the firm of P. Gallagher & Co. had sold all their "Panic" iron at from $32 per ton to $26 per ton. Never less than $26, and then when the market had greatly declined from what it was when Snyder bought. That witness believed the iron as good as any they made, and did not know why it was Snyder had sold so badly. That all the iron made by P. Gallagher & Co. was made on Cripple Creek, including this. That he never saw Snyder prior to day of trial.

Robert Ould, for plaintiff.
John S. Wise, for defendants.

HUGHES, District Judge. The only question here is, whether there was an implied warranty by Gallagher & Co. that the iron sent to Snyder in September and January was really of the quality described in their letters of the 21st and 26th August, and of later dates. None of these letters were written with a view to selling the iron to Snyder. They were the letters of consignors to a consignee, and not of a vendor to a vendee. The iron was the first that had been made at a new furnace, and the consignee was so informed. The consignors were confident of the truth of their representations of its quality, but they stated the grounds of that confidence, viz., that theirs was "Cripple Creek" iron, a species which had a good reputation; and that their founderer, who had made the best brand of the Cripple Creek iron at another furnace, and who was now making this iron of theirs, pronounced theirs to be as good as the "Wythe" iron. They made their statements not to a novice in the iron business, but to an expert, to a professional and experienced "dealer in pig iron." They describe the iron as a consignor would to a consignee, and their letters all implied that the consignee was expected to judge of the quality for himself; and they expressly requested him to get his customers

to test it. The description of an article, in good faith, to an agent, coupled with a delivery of it to him and a request that he and others shall take measures to inform themselves of its real quality, ought not, it seems to me, to be treated as implying a warranty of quality to any one who might months afterwards and after full opportunity for examination, conclude voluntarily and without solicitation to become the purchaser. There is no doubt that Snyder himself had confidence in the quality of the iron; and I infer from the evidence that his confidence was founded more on the fact that it was Cripple Creek iron than on other representations of Gallagher & Co. to him. That it was Cripple Creek iron in fact no one disputes, and has not been denied in evidence. That it was really worth from $20 to $32 per ton is proved by sales of it to other purchasers in other markets. This consignee, an experienced iron merchant and manufacturer, and a regular dealer in "pig iron," had fifty-six tons of it in his custody for more than four months before his purchase. It had been placed with him for sale coupled with a request to have it tested and tried. After this length of custody and the fullest opportunity of inspection, Snyder voluntarily proposed to purchase outright and unconditionally as to quality, all the iron that Gallagher & Co. had, up to the end of January, consigned to him. Certainly these are not circumstances from which the authorities allow us to infer a warranty of quality as part of the contract of sale. If Snyder, in his letter of the 31st of January, 1876, proposing to purchase, had said to Gallagher & Co. that he had not tested the quality of the iron, that he relied upon their representations made to him in the August preceding as to quality, and that he made his proposal to purchase on that basis, then an acceptance of his offer by Gallagher & Co. would have created a warranty, for then Gallagher & Co. would have been afforded the opportunity of electing whether or not to sell on such terms at all. It was too late for Snyder to attempt the interpolation of such a provision into the contract two weeks after his proposal had been accepted, and after Gallagher & Co. had lost control, not only of the terms of sale, but of the iron sold. Trade could not go on between man and man if bargains once made and executed could afterward be upset on the election of any one of the parties. Commerce would perish under the effects of such a license, and the courts would be crowded with suits. Unless the warranty is given at or before the time of the sale, it cannot be made to spring up afterwards at the will of either party as attempted here. Nor do I think it can be the policy of the law to hold that representations made to a consignor by a consignee long anterior to a sale, may be treated as representations of a vendor to a vendee, if the consignee in the course of events volunteers to become pur-

chaser. In the first instance they are intended for mere purpose of description, and with no thought of their being made the elements of a future contract. Contracts ought only to be implied from language used in contemplation or in the act of making them.

So much for the equities of this case. Technically it is conclusively against the plaintiff. We must not confound the law of implied warranty in general with the law as it applies particularly to the quality of the article sold. Benjamin lays down the law of caveat emptor very strongly as to warranty of the quality of chattels. He says: "So far as an ascertained specific chattel, already existing, and which the buyer has inspected, is concerned, the rule, caveat emptor, admits of no exception by implied warranty of quality." The rule as to title is, of course, different; for the knowledge of title is more or less exclusively in the vendor. So also is the rule as to the soundness of an animal different; for the vendor is supposed to be fully informed on this subject, if he has custody and the purchaser has not custody of the animal. So also is the rule different as to chattels not yet in the custody of the buyer or not yet manufactured, but sold for future delivery; for there a warranty is implied that the goods will, when delivered, in all respects conform to the sample or description according to which they were purchased. In this case it is not shown or pretended that the iron delivered in January differed in quality from that delivered in September. But in the case put by Benjamin, which is our case, of a specific chattel, already existing, and which the buyer has inspected (much more has had in his custody for four months), the rule of caveat emptor admits of no exception by implied warranty. This is not only well-settled law, but it is sound, just, equitable law, and must govern this case. This doctrine is fully established in this state by Mason v. Chappell, 15 Grat. 572. It governs not only the sale of January, but also the consignments made before that time, and the acceptances given on the consignments. The finding of the court and the judgment in the case must be for the defendants. A finding may be drawn in accordance with the facts, and a judgment entered for the defendants.